In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 20-2835 & 20-2844

DEMOCRATIC NATIONAL COMMITTEE, *et al.*,

*Plaintiffs-Appellees*,

*v.*

MARGE BOSTELMANN, SECRETARY OF THE WISCONSIN ELECTIONS COMMISSION, *et al.*,

*Defendants*,

*and*

WISCONSIN STATE LEGISLATURE, REPUBLICAN NATIONAL COMMITTEE, and REPUBLICAN PARTY OF WISCONSIN,

*Intervening Defendants-Appellants*.

Appeals from the United States District Court
for the Western District of Wisconsin.
Nos. 20-cv-249-wmc, *et al.* — **William M. Conley**, *Judge*.

SUBMITTED OCTOBER 6, 2020 — DECIDED OCTOBER 8, 2020

Before EASTERBROOK, ROVNER, and ST. EVE, *Circuit Judges*.

PER CURIAM. On September 29, 2020, we issued an order denying the motions for a stay in these appeals, because we

concluded that Wisconsin's legislative branch has not been authorized to represent the state's interest in defending its statutes. On October 2, in response to a request for reconsideration, we certified to the Supreme Court of Wisconsin the question "whether, under Wis. Stat. §803.09(2m), the State Legislature has the authority to represent the State of Wisconsin's interest in the validity of state laws." That court accepted the certification and replied that the State Legislature indeed has that authority. *Democratic National Committee v. Bostelmann*, 2020 WI 80 (Oct. 6, 2020). In light of that conclusion, we grant the petition for reconsideration and now address the Legislature's motion on the merits. (The other intervenors have not sought reconsideration.)

As we explained last week, a district judge held that many provisions in the state's elections code may be used during the SARS-CoV-2 pandemic but that some deadlines must be extended, additional online options must be added, and two smaller changes made. 2020 U.S. Dist. LEXIS 172330 (W.D. Wis. Sept. 21, 2020). In particular, the court extended the deadline for online and mail-in registration from October 14 (see Wis. Stat. §6.28(1)) to October 21, 2020; enjoined for one week (October 22 to October 29) enforcement of the requirement that the clerk mail all ballots, but only for those voters who timely requested an absentee ballot but did not receive one, and authorized online delivery during this time; and extended the deadline for the receipt of mailed ballots from November 3 (Election Day) to November 9, provided that the ballots are postmarked on or before November 3. Two other provisions of the injunction (2020 U.S. Dist. LEXIS 172330 at *98) need not be described.

The State Legislature offers two principal arguments in support of a stay: first, that a federal court should not change the rules so close to an election; second, that political rather than judicial officials are entitled to decide when a pandemic justifies changes to rules that are otherwise valid. See *Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) (sustaining Wisconsin's rules after reviewing the elections code as a whole). We agree with both of those arguments, which means that a stay is appropriate under the factors discussed in *Nken v. Holder*, 556 U.S. 418, 434 (2009).

For many years the Supreme Court has insisted that federal courts not change electoral rules close to an election date. One recent instance came in an earlier phase of this case. After the district judge directed Wisconsin to change some of its rules close to the April 2020 election, the Supreme Court granted a stay (to the extent one had been requested) and observed that the change had come too late. *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205, 1207 (2020). One of the decisions cited in that opinion is another from Wisconsin: *Frank v. Walker*, 574 U.S. 929 (2014). In *Frank* this court had permitted Wisconsin to put its photo-ID law into effect, staying a district court's injunction. But the Supreme Court deemed that change (two months before the election) too late, even though it came at the state's behest. (*Frank* did not give reasons, but *Republican National Committee* treated *Frank* as an example of a change made too late.) Here the district court entered its injunction on September 21, only six weeks before the election and less than four weeks before October 14, the first of the deadlines that the district court altered. If the orders of last April, and in *Frank*, were too late, so is the district court's September

order in this case. See also *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

The Justices have deprecated but not forbidden all change close to an election. A last-minute event may require a last-minute reaction. But it is not possible to describe COVID-19 as a last-minute event. The World Health Organization declared a pandemic seven months ago, the State of Wisconsin closed many businesses and required social distancing last March, and the state has conducted two elections (April and August) during the pandemic. If the judge had issued an order in May based on April's experience, it could not be called untimely. By waiting until September, however, the district court acted too close to the election.

The district judge also assumed that the design of adjustments during a pandemic is a judicial task. This is doubtful, as Justice Kavanaugh observed in connection with the Supreme Court's recent stay of another injunction issued close to the upcoming election. *Andino v. Middleton*, No. 20A55 (U.S. Oct. 5, 2020) (Kavanaugh, J., concurring). The Supreme Court has held that the design of electoral procedures is a legislative task. See, e.g., *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019); *Burdick v. Takushi*, 504 U.S. 428 (1992).

Voters have had many months since March to register or obtain absentee ballots; reading the Constitution to extend deadlines near the election is difficult to justify when the voters have had a long time to cast ballots while preserving social distancing. The pandemic has had consequences (and appropriate governmental responses) that change with time, but the fundamental proposition that social distancing is necessary has not changed since March. The district court did not find that any person who wants to avoid voting in

person on Election Day would be unable to cast a ballot in Wisconsin by planning ahead and taking advantage of the opportunities allowed by state law. The problem that concerned the district judge, rather, was the difficulty that could be encountered by voters who do not plan ahead and wait until the last day that state law allows for certain steps. Yet, as the Supreme Court observed last April in this very case, voters who wait until the last minute face problems with or without a pandemic.

The Court has consistently stayed orders by which federal judges have used COVID-19 as a reason to displace the decisions of the policymaking branches of government. It has stayed judicial orders about elections, prison management, and the closure of businesses. We have already mentioned *Andino* and *Republican National Committee*. See also *Clarno v. People Not Politicians Oregon*, No. 20A21 (U.S. Aug. 11, 2020) (staying an injunction that had altered a state's signature and deadline requirements for placing initiatives on the ballot during the pandemic); *Merrill v. People First of Alabama*, No. 19A1063 (U.S. July 2, 2020) (staying an injunction that had suspended some state anti-fraud rules for absentee voting during the pandemic); *Barnes v. Ahlman*, 140 S. Ct. 2620 (2020) (staying an order that overrode a prison warden's decision about how to cope with the pandemic); *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) (staying an injunction that changed the rules for ballot initiatives during the pandemic); *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (declining to suspend state rules limiting public gatherings during the pandemic).

Deciding how best to cope with difficulties caused by disease is principally a task for the elected branches of gov-

ernment. This is one implication of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), and has been central to our own decisions that have addressed requests for the Judicial Branch to supersede political officials' choices about how to deal with the pandemic. See, e.g., *Tully v. Okeson*, No. 20-2605 (7th Cir. Oct. 6, 2020) (rejecting a contention that the Constitution entitles everyone to vote by mail during a pandemic); *Illinois Republican Party v. Pritzker*, No. 20-2175 (7th Cir. Sept. 3, 2020) (rejecting a constitutional challenge to limits on the size of political gatherings during the pandemic); *Peterson v. Barr*, 965 F.3d 549 (7th Cir. 2020) (reversing an injunction that had altered procedures for executions during the pandemic); *Morgan v. White*, 964 F.3d 649 (7th Cir. 2020) (social distancing during a pandemic does not require, as a constitutional matter, a change in the rules for qualifying referenda for the ballot); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020) (rejecting a constitutional challenge to limits on the size of religious gatherings during the pandemic). Cf. *Mays v. Dart*, No. 20-1792 (7th Cir. Sept. 8, 2020) (reversing, for legal errors, an injunction that specified how prisons must be managed during the pandemic).

The injunction issued by the district court is stayed pending final disposition of these appeals.

ROVNER, *Circuit Judge*, dissenting. In the United States of America, a beacon of liberty founded on the right of the people to rule themselves, no citizen should have to choose between her health and her right to vote. An election system designed for in-person voting, coupled with an uncontrolled pandemic that is unprecedented in our lifetimes, confronts Wisconsin voters with that very choice. In the April 2020 election, Wisconsin voters sought overwhelmingly to protect themselves by voting absentee. Yet at least 100,000 of them, despite timely requests, did not receive their ballots in time to return them by election day, as the Wisconsin election code requires. Only as a result of judicial intervention in the April 2020 election were some 80,000 absentee ballots, their return delayed by an overwhelmed election apparatus and Postal Service, rescued from the trash bin. Thousands of additional voters who never received their ballots were forced to stand in line for hours on election day waiting to vote in person, risking their well-being by doing so.

For purposes of the upcoming November election, the district court ordered a limited, reasonable set of modifications to Wisconsin's election rules designed to address the very problems that manifested in the April election and to preserve the precious right of each Wisconsin citizen to vote. Its two most important provisions are comparable to those this very court sustained six months ago. The Wisconsin Election Commission, whose members are appointed by the Legislature and the Governor and are charged with administering the State's elections, has acceded to that injunction. It is not here complaining of any undue burden imposed by the district court's decision or any risk of voter confusion. Only the Wisconsin Legislature, which has chosen to make no accommodations in the election rules to account for the burdens created

by the pandemic, seeks a stay of the injunction in furtherance of its own power.

Today, by granting that stay, the court adopts a hands-off approach to election governance that elevates legislative prerogative over a citizen's fundamental right to vote. It does so on two grounds: (1) the Supreme Court's *Purcell* doctrine, as exemplified by the Court's recent shadow-docket rulings, in the majority's view all but forbids alterations to election rules in the run-up to an election; and (2) in times of pandemic, revisions to election rules are the province of elected state officials rather than the judiciary. With respect, I am not convinced that either rationale justifies a stay of the district court's careful, thorough, and well-grounded injunction. At a time when judicial intervention is most needed to protect the fundamental right of Wisconsin citizens to choose their elected representatives, the court declares itself powerless to do anything. This is inconsistent both with the stated rationale of *Purcell* and with the *Anderson-Burdick* framework, which recognizes that courts can and must intervene to address unacceptable burdens on the fundamental right to vote. The inevitable result of the court's decision today will be that many thousands of Wisconsin citizens will lose their right to vote despite doing everything they reasonably can to exercise it.

This is a travesty.

On the facts of the case, I see no deviation from *Purcell*. In all of two sentences, *Purcell* articulated not a rule but a caution: take care with last-minute changes to a state's election rules, lest voters become confused and discouraged from voting. *Purcell v. Gonzalez*, 549 U.S. 1, 4–5, 127 S. Ct. 5, 7 (2006)

(per curiam).[1] In a series of stay rulings on its shadow docket since that decision, the Supreme Court has evinced a pronounced skepticism of judicial intervention in the weeks prior to an election, *e.g. Andino v. Middleton*, — S. Ct. —, 2020 WL 5887393 (U.S. Oct. 5, 2020), but has put little meat on the bones of what has become known as the *Purcell* doctrine. *See* Nicholas Stephanopoulos, *Freeing Purcell from the Shadows*, Election Law Blog (Sept. 27, 2020) (hereinafter, "*Freeing Purcell*") ("[d]espite all of this activity, the *Purcell* principle remains remarkably opaque")[2]. Perhaps we can say at this point that *Purcell* and its progeny establish a presumption against judicial intervention close in time to an election. *See id.* ("This is the reading most consistent with *Purcell*'s actual language."). But how near? As to what types of changes? Overcome by what showing? These and other questions remain unanswered.

The Supreme Court's stay decision in this case regarding the April 2020 election did little to clear things up. This court had denied a stay as to two changes the district court ordered for purposes of that spring election: extending the deadline for requesting an absentee ballot, and extending the deadline for receipt of completed absentee ballots. *Dem. Nat'l Com. v. Bostelmann*, 2020 WL 3619499, at *1 (7th Cir. April 3, 2020). The Wisconsin Legislature appealed only the ballot-receipt deadline. Although the Court had critical things to say about the

---

[1] "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Purcell*, 549 U.S. at 4–5, 127 S. Ct. at 7.

[2] Available at https://electionlawblog.org/?p=115834.

last-minute change in rules ordered by the district court's injunction (in part because the district court had ordered relief beyond what the plaintiffs themselves had requested), it then proceeded to impose one of its own, ordering that absentee ballots must either be delivered or postmarked on or before election day in order to be counted. *Repub. Nat'l Com. v. Dem. Nat'l Com.*, 140 S. Ct. 1205, 1207, 1208 (2020). The Court was also at pains to emphasize that it was reserving judgment as to "whether other reforms or modifications in election procedures in light of COVID-19 are appropriate." *Id.* at 1208. Apart from that, the Supreme Court's pattern of staying similar sorts of injunctions in recent months is long on signaling but short on concrete principles that lower courts can apply to the specific facts before them.

Until the Supreme Court gives us more guidance than *Purcell* and an occasional sentence or two in its stay rulings have provided, all that lower courts can do—and, I submit, must do—is carefully evaluate emergent circumstances that threaten to interfere with the right to vote and conscientiously evaluate all of the factors that bear on the propriety of judicial intervention to address those circumstances, including in particular the possibility of voter confusion.

A variety of factors should inform a court's decision whether or not to modify election rules. *See Freeing Purcell*. On balance, these factors support rather than undermine the district court's decision here.

The first consideration is whether the proposed modifications might confuse voters. That risk is minimal here. Only two of the five modifications that Judge Conley ordered alter what is expected of voters: the extension of the deadline to register online or by mail, and the extension of the deadline

for receipt of absentee ballots. Both of these modifications redound to the benefit of voters, and certainly do not lay a trap for the unwary. **We upheld (*i.e.*, denied a stay as to) comparable changes for the April election, and the Supreme Court modified the latter only to the extent of requiring that an absentee ballot be delivered or postmarked on or before election day.**[3] Neither we nor our superiors would have done so had there been a substantial risk of confusing voters. The other three changes are directed to election officials and what they must do. By their nature, these changes will not impact voter decisions.

A second consideration is whether the changes to election rules will burden election officials and increase the odds that they make mistakes. Judge Conley gave careful attention to whether state election officials would have the time and ability to implement the changes he ordered. The Wisconsin Election Commission signaled a preparedness and ability to comply with these modifications (more on these points below), and the State Executive is not here to contend otherwise.

We must consider, third, the likelihood that voter disenfranchisement will ensue from the changes Judge Conley ordered. The answer here is straightforward: it will not. On the contrary, his directives are aimed at preventing disenfranchisement. And as detailed below, the results of the April

---

[3] In its April decision, this court denied a stay as to an extension of the deadline to request an absentee ballot and the deadline for receipt of a completed absentee ballot. *Bostelmann*, 2020 WL 3619499, at *1. The district court had also ordered an extension of the deadline to register online for the April election, *see Dem. Nat'l Com. v. Bostelmann*, 447 F. Supp. 3d 757, 765–67 (W.D. Wis. Mar. 20, 2020), but a stay was not sought as to that extension.

election in Wisconsin demonstrate that only in the absence of judicial intervention will voters be disenfranchised.

Fourth, there has been no lack of diligence on the part of the plaintiffs in seeking relief. They sought relief in advance of the April election, as the pandemic was heating up, succeeded in part as to that election, and promptly renewed their pursuit of relief in the immediate aftermath of that election. After they defeated the Legislature's attempt to dismiss their claims, *see Dem. Nat'l Com. v. Bostelmann*, 2020 WL 3077047 (W.D. Wis. June 10, 2020), they proceeded with discovery, presented their case at an evidentiary hearing in August, and obtained a favorable ruling in September. There has been no dallying on the plaintiffs' part. For its part, the district judge responded with both alacrity and attention to detail. But according to this court, which has retroactively announced a May deadline for any changes to election rules, it was all for naught—their work was over before it began.

Fifth and finally, although the election is drawing close, the district judge issued his injunction six weeks prior to the election, leaving ample time for Wisconsin election officials to alter election practices as ordered and communicate the changes to the public, and for his judgment to be reviewed by this court and, if necessary, by the Supreme Court.[4] This is a

---

[4] As the *Gear* plaintiffs point out, other circuit courts have upheld injunctions modifying state election procedures in the immediate run-up to elections when the courts deemed the modifications necessary to prevent voter disenfranchisement. *E.g.*, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12–15 (D.C. Cir. 2016) (2-1 decision) (six weeks before election); *Obama for Am. v. Husted*, 697 F.3d 423, 436–37 (6th Cir. 2012) (one month before election); *U.S. Student Ass'n Fdn. v. Land*, 546 F.3d 373, 387–89 (6th Cir. 2008) (2-1 decision) (six days before election).

far cry from April, when the court's injunction was issued just eighteen days prior to the election and was modified to grant additional relief just five days prior to the election. The Covid-19 pandemic is no longer new but neither is it a static phenomenon; infection rates have ebbed and surged in multiple waves around the country and it is only *now* that Wisconsin is facing crisis-level conditions. I suppose that the district court could have issued a preliminary injunction in May based on the experience with the April election, as my colleagues suggest, but the defendants no doubt would have argued that it was premature to deem modifications to the election code warranted so far in advance of the election,[5] and there is a fair chance that this court might have agreed with them. Wisconsin infection rates in early May were less than one quarter of what they are now. Nothing in *Purcell* or its progeny forecloses modifications of the kind the district court ordered in the worsening circumstances that confront Wisconsin as the election draws nigh. Otherwise, courts would never be able to order relief addressing late-developing circumstances that threaten interference with the right to vote.[6]

---

[5] In fact, the defendants did argue precisely that in moving to dismiss the DNC's complaint shortly after the April election took place. *See Dem. Nat'l Com. v. Bostelmann*, 2020 WL 3077047 (W.D. Wis. June 9, 2020).

[6] Professor Stephanopoulos cites the Bipartisan Campaign Reform Act's special restrictions on campaign ads imposed within 60 days of an election, and the Military and Overseas Voter Empowerment Act's requirement that absentee ballots be sent to certain voters at least 45 days prior to an election, as possible guideposts for determining when the eleventh hour has arrived for judicial intervention into an election. *Freeing Purcell*. Obviously, we are past both reference points here. But Stephanopoulos himself argues that this sort of deadline (which, of course, the Supreme

The court's second rationale for granting a stay—that "the design of adjustments during a pandemic" is a task for elected officials rather than the judiciary—announces an ad hoc carve-out from the *Anderson-Burdick* framework for the review of state election rules. *See Anderson v. Celebrezze*, 460 U.S. 780, 103 S. Ct. 1564 (1983); *Burdick v. Takushi*, 504 U.S. 428, 112 S. Ct. 2059 (1992). That framework does call for deference to state officials, *depending upon* the degree of restriction that state election rules impose on the right to vote: severe restrictions demand strict judicial scrutiny, whereas modest, unexceptional restrictions enjoy a presumption of validity. *Id.* at 434, 112 S. Ct. at 2063–64. But what the majority proposes is total deference to state officials in the context of pandemic, with no degree of judicial scrutiny at all. That I cannot endorse. Communicable diseases can impose real and substantial obstacles to voting, and voting rules that are unobjectionable in normal conditions may become unreasonable during a pandemic, when leaving one's home and joining other voters at the polls carries with it a genuine risk of becoming seriously ill.

Notably, the Wisconsin Election Commission, whose members are appointed by two sets of elected officials—the Legislature and the Governor—was represented in the litigation below. As I noted at the outset, the Commission has acceded to the district court's injunction and has not sought a stay. As long as we are discussing deference to state officials, the views of the Commission, which is charged with enforcing Wisconsin's election rules, ought to count for something.

---

Court has yet to adopt) should not be conclusive in assessing the propriety of judicial intervention.

Justice Kavanaugh's concurrence in *Andino* posits that a state legislature's decision whether or not to alter voting rules in response to the Covid-19 pandemic ordinarily should not be second-guessed by the judiciary, which lacks the legislature's presumed expertise in matters of public health and is not accountable to the people. 2020 WL 5887393, at *1. But state legislatures do not possess a monopoly on matters of public health, *see, e.g.*, *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. 2020) (reviewing Governor's executive order restricting size of public assemblies in light of public health emergency), and when state government is divided as it is in Wisconsin, stalemates occur. When a state proves unwilling or unable to confront and adapt to external forces that pose a real impediment to voting, it places into jeopardy the most cherished right that its citizens enjoy. (The debacle that occurred with respect to in-person voting in Wisconsin on April 7, as I discuss below, makes that point all too clear.) The right to vote is a right of national citizenship. *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S. Ct. 995, 999–1000 (1972). It is essential to the vitality of our democratic republic. *E.g.*, *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 535 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").[7] And no citizen of Wisconsin should be forced to risk his or her life or well-being in order to exercise this invaluable right. Wholesale deference

---

[7] Indeed, the irony of Justice Kavanaugh's rationale is that unchecked deference to the state legislature as to voting procedures during a pandemic may render legislators *un*accountable to voters wishing to exercise their franchise.

to a state legislature in this context essentially strips the right to vote of its constitutional protection.

I submit that our foremost duty in this case is to protect the voting rights of Wisconsin citizens, which are seriously endangered, rather than discretionary action (or inaction) by one branch of state government, in the face of a pandemic. My evaluation of the district court's injunction proceeds on that understanding.

A central premise of the Legislature's request for a stay of the changes that Judge Conley ordered to Wisconsin's election rules is that the ability to register and/or vote in person remains a perfectly acceptable alternative to any Wisconsin voter who is unable to register in advance of the election and to return an absentee ballot prior to election day. Were these ordinary times, I would have no difficulty agreeing with the Legislature. But what the Legislature downplays—indeed, barely acknowledges in its briefs—is the concrete risk that a 100-year pandemic, which at present is surging in Wisconsin, poses to anyone who must brave long lines, possibly for hours, in order to register and vote in person.

Historically, the vast majority of Wisconsin voters have cast their ballots in person, and Wisconsin's election system has evolved against that backdrop, with provisions for absentee voting having served as a courtesy for the minority of voters whose work, travel, or other individual circumstances presented an obstacle to voting in person on election day. D. Ct. Op. 15, 39. Absentee ballots have often constituted less than 10 percent of ballots cast in Wisconsin, and, until this year, never more than 20 percent. D. Ct. Op. 15. Voters have also relied heavily on the State's liberal provision for same-day voting registration, with some 80 percent of all Wisconsin

voter records reflecting some use of this feature. D. Ct. Op. 39 (citing R. 532 at 58.) The Covid-19 pandemic has turned this in-person voting paradigm on its head, as Judge Conley emphasized. Whereas, in the April 2019 election, voters requested (and were sent) a total of 167,832 absentee ballots (D. Ct. Op. 12 n.9), one year later, that total increased nearly eight-fold to 1,282,762 (D. Ct. Op. 12), with absentee ballots comprising 73.8 percent of ballots counted in the April 2020 election (D. Ct. Op. 15).

The strain that the pandemic and the sudden, unprecedented preference for absentee voting placed on state and local officials had predictable results in the April 2020 election. Election officials scrambled to keep up with the overwhelming demand for absentee ballots. Between April 3 and April 6 (the day before the election), local officials were still in the process of mailing more than 92,000 absentee ballots, virtually all of which were sent too late for them to be filled out and mailed back by election day. D. Ct. Op. 13. Another 9,388 ballots were timely applied for but never sent. D. Ct. Op. 13. Approximately 80,000 absentee ballots were completed and postmarked on or before election day but were only received by election officials in the six days *after* the statutory deadline for such ballots. D. Ct. Op. 17. These ballots would not have been counted but for the district court's order, sustained by this court and modified by the Supreme Court, extending the deadline.

Notwithstanding the fact that nearly three-quarters of the votes cast in the April 2020 election were via absentee ballots, in-person voting in that election presented challenges of its own. Poll workers were in short supply, as individuals who would normally have staffed the polls (many of them

seniors[8]) stayed away in droves, particularly in urban locations. Milwaukee, with a population of 592,025, normally operates 180 polling sites. The city could manage to open only **five** on April 7. D. Ct. Op. 16. Green Bay, population 104,879, normally operates 31 polling sites. On April 7, just **two** were open. D. Ct. Op. 16. Lines of voters (thousands of whom had timely applied for absentee ballots but had not received them) stretched for blocks and people waited hours to vote.[9] Some were masked, many were not. Some number of voters (we do not know how many) showed up to vote in person after not receiving an absentee ballot prior to election day and, discouraged by the long lines and wait times, walked away without casting a vote. D. Ct. Op. 17 (citing voter declarations). Those who stayed in line faced a discernible risk of becoming

---

[8] *See* Michael Barthel and Galen Stocking, *Older people account for large shares of poll workers and voters in U.S. general elections*, PEW RESEARCH CENTER: FACT TANK, NEWS IN THE NUMBERS (April 6, 2020), https://www.pewresearch.org/fact-tank /2020/04/06/older-people-account-for-large-shares-of-poll-workers-and-voters-in-u-s-general-elections/; Laurel White, *'It's Madness.' Wisconsin's election amid coronavirus sparks anger*, NPR (April 6, 2020), https://www.npr.org/2020/04/06 /827122852/it-s-madness-wisconsin-s-election-amid-coronavirus-sparks-anger.

[9] *See*, *e.g.*, Astead W. Herndon and Alexander Burns, *Voting in Wisconsin During a Pandemic: Lines, Masks and Plenty of Fear*, NEW YORK TIMES (April 7, 2020, updated May 12, 2020) ("The scenes that unfolded in Wisconsin showed an electoral system stretched to the breaking point by the same public health catastrophe that has killed thousands and brought the country's economic and social patterns to a virtual standstill in recent weeks."); Benjamin Swasey & Alana Wise, *Wisconsin vote ends as Trump blames governor for long lines*, NPR (April 7, 2020), https://www.npr.org/2020/04/07/828835153/long-lines-masks -and-plexiglass-barriers-greet-wisconsin-voters-at-polls.

infected. Although the evidence on this point is mixed, public health officials determined that 71 individuals contracted Covid-19 after voting in-person or working at the polls on April 7[10]; one analysis extrapolates from the available data to estimate that a ten percent increase in in-person voters per polling location is associated with an eighteen percent increase in Covid-19 cases two to three weeks later.[11]

The district court, presented with largely undisputed evidence that (1) the demand for absentee ballots in the forthcoming general election in November will be even greater than it was in April (as many as 2 million absentee ballot requests are anticipated), (2) recent cutbacks at the U.S. Postal Service and the resulting delays in mail delivery will present an even greater obstacle to registering and voting by mail than it did in the spring, and (3) persistent concerns about a shortage of poll workers on election day again raise the specter of long lines to vote in person, ordered a set of five limited modifications to Wisconsin election rules aimed at compensating for these conditions and ensuring, consistent with public health advice and voters' obvious preference for absentee voting, that voters who wish to vote by mail may do so. The two most significant of these conditions are comparable to

---

[10] *See* David Wahlberg, *71 people who went to the polls on April 7 got Covid-19; tie to election uncertain*, WIS. STATE J. (May 16, 2020), https://madison.com/wsj/news/local/health-med-fit/71      -people-who-went-to-the-polls-on-april-7-got-covid-19-tie-to      /article_ef5ab183-8e29-579a-a52b-1de069c320c7.html.

[11] Chad Cotti, Ph.D., et al., *The Relationship between In-Person Voting and COVID-19: Evidence from the Wisconsin Primary*, Nat'l Bureau of Economic Research, Working Paper No. 27187 (May 2020, revised October 2020), available at https:// www.nber.org/papers/w27187.

those sustained by this court, as modified in one respect by the Supreme Court, for the April election. *None* are opposed here by the Wisconsin Executive, which is charged with administering the election. *See Repub. Nat'l Com. v. Common Cause Rhode Island*, — S. Ct. —, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020) (noting, *inter alia*, in denying stay of judicially ordered modifications to state election law, that "here the state election officials support the challenged decree …"). To the extent these modifications intrude modestly upon the State's ability to establish its own rules for conducting elections, they are more than justified by the present pandemic and the unacceptable risks that in-person voting presents to the citizens of Wisconsin.

The Legislature challenges Judge Conley's exercise of discretion in ordering these modifications as if the Covid-19 pandemic presented a quotidian problem in an otherwise routine election, where the options for voting in-person might represent an entirely adequate alternative to voting by mail. The State's experience with the April election and the current state of the pandemic in Wisconsin demonstrate the fallacy in this premise.

As I write this dissent, new infections are surging in Wisconsin and threatening to overwhelm the State's hospitals. Judge Conley noted that in the weeks prior to his decision, new infections had doubled from 1,000 to 2,000 per day. D. Ct. Op. 20. As of Tuesday, October 6, a seven-day average of 2,346 new cases of Covid-19 was reported.[12] The Governor

---

[12] Wis. Dep't of Health Servs., COVID-19: Wisconsin Cases (as of October 6, 2020), https://www.dhs.wisconsin.gov/covid-19/cases.htm#confirmed.

has declared a public health emergency.[13] A draft report from the White House Coronavirus Task Force dated Monday of last week described a "rapid worsening of the epidemic" in Wisconsin and placed the State in the "red zone" for Covid-19 cases, with the third-highest number of such cases per 100,000 population in the country and seventh-highest test positivity rate. Nearly half of all Wisconsin counties now have high levels of community transmission. Coronavirus Task Force, State Report—Wisconsin, at 1 (Sept. 27, 2020).[14] Hospitalization rates are at record highs in the State, with facilities in northeast Wisconsin approaching capacity due to the surge in Covid-19 cases[15]; the State is now proceeding with plans to open a field hospital to address the shortage of hospital beds.[16] Against this worsening backdrop, the district court credited

[13] Executive Order No. 90, Office of Wisconsin Governor (Sept. 22, 2020), available at https://evers.wi.gov/Pages/Newsroom/Executive-Orders.aspx.

[14] Available at WASHINGTON POST website, https:// www.washingtonpost.com/context/white-house-coronavirus-task-force-report-warns-of-high-wisconsin-covid-19-spread-in-wisconsin/e5f16345-fcb4-4524-975e-8011379ef0da/.

[15] Mary Spicuzza, et al., *Some hospitals forced to wait-list or transfer patients as Wisconsin's coronavirus surge continues*, MILWAUKEE JOURNAL SENTINEL (Sept. 30, 2020), https:// www.jsonline.com/story/news/2020/09/30/wisconsin-hospitals-wait-list-patients-covid-19-surge-coronavirus-green-bay-fox-valley-wausau/3578202001/.

[16] Mary Spicuzza and Molly Beck, *Wisconsin to open field hospital at State Fair Park on October 14 as surge in coronavirus patients continues in Fox Valley, Green Bay*, MILWAUKEE JOURNAL SENTINEL (October 7, 2020), https://www.jsonline.com/ story/news/local/wisconsin/2020/10/07/wisconsin-preparing-open-alternate-care-facility-state-fair-park-state-continues-face-surge-covid-1/5909769002/.

the opinion of a nationally recognized expert in public health surveillance, who opined that "[t]here is a significant risk to human health associated with in-person voting during the COVID-19 pandemic[;] [t]here will almost certainly be a significant risk of contracting and transmitting COVID-19 in Wisconsin on and around November 3, 2020[;] [t]he risk of contracting or transmitting COVID-19 will deter a substantial portion of Wisconsinites from voting in person on November 3, 2020[;] and [i]ncreasing the ease and availability of absentee-ballot voting options is critical to protecting public health during the November 3, 2020 election." D. Ct. Op. 23; Expert Report of Patrick Remington, M.D. at 1 (R. 44 in Case No. 3:20-cv-00459-wmc).

Presented with the evidence as to what occurred in April and what is happening now with respect to the pandemic, Judge Conley reasonably concluded that (1) a substantial number of eligible Wisconsin voters will not meet the October 14 deadline to register online or by mail, leaving them with only in-person options to register, (2) of the 1.8 to 2 million registered voters who are expected to timely request absentee ballots (D. Ct. Op. 20, 47), as many as 100,000 will not be able to return those ballots by election day through no fault of their own (D. Ct. Op. 51), and (3) when faced with the risks associated with registering or voting in-person, and potentially having to wait in line for hours in order to do so, some number of voters will deem the risk too great. These conclusions explain why he ordered modest adjustments to Wisconsin's election rules in order to minimize that possibility.

Of all of us, Judge Conley is the one judge who heard the evidence first-hand and is closest to the ground in Wisconsin. We owe deference to his judgment. He considered the

*Anderson-Burdick* factors for constitutional challenges to state election rules. Consistent with *Luft v. Evers*, 963 F.3d 665, 671 (7th Cir. 2020), he considered the Wisconsin election rules in their totality in assessing the burdens that those rules, under the present circumstances, impose on the right to vote. He considered *Purcell's* admonition that judicial orders modifying election rules can result in voter confusion and an incentive not to vote, especially as an election draws closer. 549 U.S. at 4–5, 127 S. Ct. at 7. He considered this court's prior ruling in April granting a stay as to all but two of the modifications ordered for the April election. *Bostelmann*, 2020 WL 3619499. And he considered the Supreme Court's ruling, issued one day prior to the April election, which both chastised the district court for altering Wisconsin's election rules within days of the election but also modified the extension of the ballot-receipt deadline to require that mailed absentee ballots be delivered or postmarked on or before election day and accepted the deadline change as modified. *Republican Nat'l Com.*, 140 S. Ct. at 1207, 1208.

In view of the fact that this court allowed extensions of the ballot-request deadline and ballot-receipt deadline to be implemented in the April election, it is not clear to me why the majority has decided to stay comparable modifications (effectively nullifying them) for the November election. Yes, the Covid-19 virus is no longer a new menace and Wisconsin election officials have now had the experience of conducting two elections during the pandemic. But the Wisconsin election code remains one designed primarily for in-person voting, whereas the surge of Covid-19 cases in Wisconsin has only increased the risks associated with in-person voting since April. The logistical demands posed by absentee voting will if anything be greater for the November general election,

with possibly a million additional absentee ballots to be sent and returned by mail; and with the recently-discovered cutbacks in Postal Service capacity,[17] there is even greater reason to be concerned about the ability of voters to both register and vote by mail. Registering and voting in person remain as alternatives, but no legislator, no election official, and certainly no judge can assure Wisconsin voters that there is no risk associated with registering and/or voting in person as infection rates spike in their communities, especially in high-population urban areas. Election officials may *hope* that more polling places will be open in November than April, but they cannot guarantee that enough poll workers will show up on election day to avoid the sorts of long voter lines and waits that made headlines then. Nor, by the way, can anyone assure voters that they will not be waiting in line next to one or more unmasked voters, or one who is contagious with the coronavirus. Indeed, a lawsuit challenging the Governor's mask mandate is presently pending in the Wisconsin courts.[18]

---

[17] *See, e.g.*, Jacob Bogage, *et al.*, *DeJoy pushes back on criticism of changes to Postal Service, says he won't restore sorting machines*, WASHINGTON POST (Aug. 24, 2020), https://www.washingtonpost.com/politics/2020/08/24/dejoy-testimony-usps-house /; Elise Viebeck and Jacob Bogage, *Federal judge temporarily blocks USPS operational changes amid concerns about mail slowdowns, election*, WASHINGTON POST (Sept. 17, 2020), https://www.washingtonpost.com/politics/federal-judge-iss-ues-temporary-injunction-against-usps-operational-changes-amid-concerns-about-mail-slowdowns/2020/09/ 17/34fb85a0-f91e-11ea-a275-1a2c2d36e1f1_story.html.

[18] *See* Scott Bauer, *Conservative law firm seeks to end Wisconsin mask order*, AP NEWS (Sept. 28, 2020), https://apnews.com/article/virus-outbreak-health-wisconsin-public-health-270d663b9411b33a17fc45fdf8ad2720; Molly Beck, *GOP leaders go to court in support of effort to strike down Tony Evers' mask mandate*, WISCONSIN JOURNAL SENTINEL (Oct. 2, 2020),

Having in mind the shortfalls with the April election and the current public health crisis posed by the pandemic, it is not unreasonable for Wisconsin voters to view the option of in-person registration and voting as a form of Russian roulette. For eligible voters who are unable to register by mail by the statutory deadline (and for the April election, there were more than 57,000 people who registered after that deadline, thanks to the district court's extension of that deadline, D. Ct. Op. 17) and for voters who timely request an absentee ballot but who either do not receive it by election day or receive it too late to return it by election day (more than 120,000 absentee ballots were not returned by election, *see* D. Ct. Op. 15), the risks associated with in-person registration and voting amount to a concrete and unacceptable, and in my view, severe, restriction on the right to vote. *See Luft*, 963 F.3d at 672 (citing *Burdick*, 504 U.S. at 434, 112 S. Ct. at 2063; *Anderson*, 460 U.S. at 788, 103 S. Ct. at 1569–70; *Acevedo v. Cook Cnty. Officers Electoral Bd.*, 925 F.3d 944 (7th Cir. 2019)). This is especially true of individuals who are 65 years of age or older (more than 900,000 people in Wisconsin[19]), obese (some 40 percent of Wisconsin adults[20]), or suffer from chronic health conditions that render them especially vulnerable to complications from a

https://www.jsonline.com/story/news/politics/2020/10/02/ gop-goes-court-support-effort-strike-down-mask-mandate/ 3592966001/.

[19] See Wis. Dep't of Health Servs., *Demographics of Aging in Wisconsin*, Am. Community Survey Statewide & Cnty. Aging Profiles, 2014-18, State of Wis. Profile of Persons Ages 65 & Older (Jan. 20, 2020), https://www.dhs.wisconsin.gov/aging/demographics.htm.

[20] *See* Tala Salem, *Wisconsin obesity rate higher than previous estimates*, U.S. NEWS & WORLD REPORT (June 11, 2018), https://www.us-news.com/news/health-care-news/articles/ 2018-06-11/wisconsin-obesity-rate-higher-than-previous-estimates.

Covid-19 infection (some 45 percent of all adults nation-wide[21]).

Of course it is true that voters have the ability to plan ahead, register early if need be, and request absentee ballots early in order to ensure that they have adequate time to complete and return their ballots prior to election day.[22] But voters may also reasonably rely on the State's own deadlines for advance registration and requesting an absentee ballot as a guide to the amount of time necessary for their registrations to be processed and their ballots to be issued, completed, and returned. Voters do not run the State's election apparatus or the U.S. Postal Service; they have no special insight into how quickly their timely requests to register and/or vote by mail will be processed by election officials and how quickly the Postal Service will deliver their ballots. It is not reasonable to insist that voters act more quickly than state deadlines require them to do in order to ensure that either the State or the Postal Service does not inadvertently disenfranchise them because they are overwhelmed with the volume of mail-in registrations and absentee ballots.

---

[21] See Mary L. Adams, *et al.*, *Population-based estimates of chronic conditions affecting risk for complications from coronavirus disease, United States*, 26 EMERGING INFECTIOUS DISEASES J. No. 8 (August 2020), https://wwwnc.cdc.gov/eid/article/26/8/20-0679 _article.

[22] Completing an absentee ballot is not a matter of simply filling it out. Wisconsin requires absentee voters to have their ballots signed by a witness. *See* Wis. Stat. § 6.87(4)(b). Some 600,000 Wisconsin voters live alone (D. Ct. Op. 21), which means they must seek out someone outside of their household to sign their ballots. During a time of surging Covid-19 infections, that is not necessarily a simple task.

It is also true that voters who receive their ballots just prior to the election have the option of delivering their ballots to a dropbox or to the polls on election day. But significant numbers of Wisconsin voters lack a driver's license (including roughly half of African American and Hispanic residents) and therefore cannot drive themselves to a poll or dropbox.[23] Relying on public transportation, a taxi, a ride-sharing service, or a lift from a neighbor to make the trip presents difficulties and risks of its own, which cannot be justified if the voter has timely complied with existing deadlines and yet cannot meet existing deadlines through no fault of her own.

I recognize that the district court's decision to order modifications to Wisconsin's election practices represents an intrusion into the domain of state government, but in my view it is a necessary one. We are seven months-plus into this pandemic. The Legislature has had ample time to make modifications of its own to the election code and has declined to do so. The Wisconsin Elections Commission, divided 3-3 along party lines, concluded that it lacks the authority to order such modifications. This leaves voters at the mercy of overworked state and local election officials, a hamstrung Postal Service, and a merciless virus. What we must ask, as Judge Conley did, is whether Wisconsin's election rules, which were not drafted for pandemic conditions, effectively restrict a Wisconsin citizen's right to vote under current conditions. The answer, I submit, is yes. Based on the State's experience with the April election, we *know* it is likely that tens of thousands of

---

[23] *See* John Pawasarat, *The Driver License Status of the Voting Age Population in Wisconsin*, Employment and Training Institute, Univ. of Wis.-Milwaukee (June 2005), available at https://dc.uwm.edu/eti_pubs/68/.

voters will not meet the October 14 deadline to register online or by mail, especially if they are relying on the mail to complete that process. We *know* that tens of thousands of voters likely will not be able to return their ballots by mail before election day, through no fault of their own. We *know* that registering or voting in person, especially on election day, will expose some number of voters to a concrete risk of Covid-19 infection. Collectively, these conditions pose a real and substantial impediment to the right to vote. Whether that obstacle is viewed as modest or severe, and whether viewed through the lens of rational basis review or strict scrutiny, it is unacceptable. The State itself purports to want people to vote absentee, and yet has done nothing to alter its election rules to make the necessary accommodations to ensure that voters are not needlessly disenfranchised by the overwhelming shift from in-person to absentee voting.

I conclude with a just a few words about each of the individual modifications that the district court ordered. Individually and collectively, these modifications, in my view, represent a reasonable, proportional response to current conditions aimed at preserving the right to vote.

Of these, the most important, and in my view, the most essential of these modifications is the six-day extension of the deadline for the return of absentee ballots by mail to November 9, 2020, so long as the ballots are postmarked on or before election day. Of the five modifications ordered by the district court, none is more directly aimed at protecting the right to vote, in that it seeks to ensure that ballots that have been timely cast by voters will be counted. The circumstances that warranted a similar extension in April are even more serious now: the Covid-19 pandemic makes it more imperative that

as many voters as possible vote by absentee ballot; the demand for absentee ballots is virtually certain to be even greater (record-shattering) than it was in April, placing unprecedented demands on election officials and the U.S. Postal Service alike; and cutbacks implemented by the U.S. Postal Service this summer (not all of which have been suspended or reversed) threaten recurrent if not worse delays in the delivery and return of absentee ballots. The fact that some 80,000 ballots were received by mail after election day in April is all the proof necessary that an extension of the receipt deadline is vital as a means of protecting the voting rights of tens of thousands of Wisconsin voters—voters who, it cannot be said too often, will timely request and complete absentee ballots but are unable to return them by the election day deadline by no mistake or omission of their own. Against this, all that the Legislature offers is a wish to have the results of the election conclusively determined on election night. But weighed against the constitutional right to vote, this is thin gruel.

The one-week extension of the deadline to register online or by mail is reasonable in terms of both the worsening pandemic and the slowdown in mail service. As Judge Conley pointed out, Wisconsin voters are in the habit of using the State's same-day registration option to register or update their registration on election day. Only as Covid-19 infections surge in Wisconsin may voters now realize that in-person registration on election day poses unique risks, particularly if lines at the polls turn out to be as long as they were in April. At the same time, voters seeking to register by mail may run into the same problems that absentee voters encountered in April with delays in the U.S. Mail. A brief extension of the advance registration deadline is an appropriate response, and the Wisconsin Election Commission conceded that the

extension would still leave adequate time for election officials to update pollbooks with registration information in time for election day.

The directive to add language to the MyVote and WisVote websites (along with any relevant printed materials) regarding the "indefinitely confined" exception to the photo i.d. requirement is an extremely limited order aimed at eliminating voter confusion. Wisconsin law requires voters to present appropriate photographic identification in order to obtain a ballot, whether in-person or by mail. There is an exception to this requirement for a voter who is "indefinitely confined" due to age, infirmity, or disability; the signature of the voter's witness will be deemed sufficient in lieu of proof of i.d. The Commission's March 2020 guidance on this exception makes clear that a voter need not be permanently or totally disabled and wholly unable to leave one's residence in order to qualify for this exception, but this guidance is not easily available to voters and the district court found that there was a substantial risk of voter confusion as to the scope of the exception without further guidance. This was a reasonable order.

The order to permit replacement absentee ballots to be transmitted electronically to domestic civilian voters who have not received their ballots by mail in the penultimate week prior to the election (October 22–29) addresses a concrete problem that emerged in the April election: not all absentee ballots will reach voters in time for the election even if they have been timely requested. Recall that tens of thousands of ballots were still being mailed out within a few days of the election, making it impossible for voters to return them by mail (if they received them at all) by election day. Wisconsin law prohibits election officials from sending ballots by

electronic means to anyone but military or overseas voters. That restriction was modified by judicial order in 2016, *see One Wisconsin Inst., Inc. v. Thomsen*, 198 F. Supp. 3d 896, 946–48 (W.D. Wis. 2016), and until our June 2020 decision in *Luft* reversing that modification, election officials were making absentee ballots available online or by fax as necessary to domestic civilian voters. Restoring that practice for a limited window of time in advance of the November election makes eminent sense as a means of protecting the right to vote by voters who have timely requested an absentee ballot but have not received it in the mail as the election approaches.

Finally, in view of the severe shortages of poll workers that hobbled the April election with numerous poll closings and massive voting delays, the order that local officials be allowed to employ poll workers who are not electors in the county where they will serve is both necessary and reasonable. Adequate staffing of the polls is essential to minimizing voter wait times and, in turn, public health risks. Allowing poll workers (be they civilians or National Guard reservists) to work outside of their own counties is a modest and entirely reasonable means of achieving that end, one that poses no risk to the integrity of the election. The Legislature has articulated no reason why this accommodation is either unnecessary or inappropriate.

Given the great care that the district court took in issuing its preliminary injunction and the ample factual record supporting its decision, I am dismayed to be dissenting. It is a virtual certainty that current conditions will result in many voters, possibly tens of thousands, being disenfranchised absent changes to an election code designed for in-person voting on election day. We cannot turn a blind eye to the present

circumstances and treat this as an ordinary election. Nor can we blindly defer to a state legislature that sits on its hands while a pandemic rages. The district court ordered five modest changes to Wisconsin's election rules aimed at minimizing the number of voters who may be denied the right to vote. Today, in the midst of a pandemic and significantly slowed mail delivery, this court leaves voters to their own devices.

Good luck and G-d bless, Wisconsin. You are going to need it.